# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-333

## LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT

## VERSUS

## JEFFERY C. PERSON, ET AL.

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-2010-0991
HONORABLE JOHN DAMIAN TRAHAN, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## JUDGE JIMMIE C. PETERS

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, Jimmie C. Peters, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

**REVERSED AND RENDERED.**

Thibodeaux, Chief Judge, dissents and assigns written reasons.
Saunders, J., dissents for the reasons assigned by Thibodeaux, Chief Judge.

Charles Morris Rush
Rush, Rush & Calogero
202 Magnate Drive
Lafayette, LA 70508
Telephone: (337) 235-2425
COUNSEL FOR DEFENDANTS/APPELLANTS:
    Jeffery C. Person
    Sheila Caruso Person

Theodore Glenn Edwards, IV
Jacob H. Hargett
Davidson, Meaux, Sonnier, McElligott, Fontenot, Gideon & Edwards
P. O. Drawer 2908
Lafayette, LA 70502-2908
Telephone: (337) 237-1660
COUNSEL FOR PLAINTIFF/APPELLEE:
    Lafayette City-Parish Consolidated Government

PETERS, J.

The litigation arises from efforts by the Lafayette, Louisiana City-Parish Consolidated Government (City-Parish) to acquire title to immovable property owned by Jeffrey and Sheila Person by expropriation for the purpose of extending an existing road into a residential subdivision in the City of Lafayette. The Persons appeal the trial court judgment allowing the City-Parish to acquire title to the disputed property by expropriation. For the following reasons, we reverse the trial court judgment and render judgment in favor of the Persons, rejecting the City-Parish's attempt to use the power of expropriation in this instance.

## FACTS AND PROCEDURAL HISTORY

The record before us contains numerous exhibits filed by the litigants. While the exhibit record is substantial, only five witnesses testified at trial: Thomas R. Carroll, III, the City-Parish Director of Public Works; Tony R. Tramel, the City-Parish Director of Traffic and Transportation; Shelley Breaud, The Settlement Residents' Association President; Jeffrey C. Person; and Dr. Douglas Wiersig, the owner of a Houston, Texas private consulting engineering firm. The background of the litigation is provided primarily through the exhibits while the justification for expropriation, or lack thereof, is derived primarily from the testimony of the witnesses.

The trial record establishes that The Settlement Subdivision (The Settlement) is a residential subdivision in the City of Lafayette that was developed in 1979 and currently contains approximately 158 residential units. It is located northwest of the intersection of two major streets in Lafayette: Kaliste Saloom Road (Kaliste Saloom), which runs generally northeast and southwest, and Ambassador Caffery Parkway (Ambassador Caffery), which runs generally northwest and southeast. The original plan of The Settlement provided for three

points of ingress and egress, all onto Kaliste Saloom: Old Settlement Road (Old Settlement), which is the closest to the intersection of Kaliste Saloom and Ambassador Caffery; North Meyers Road (North Meyers), which is the next intersection proceeding southwest on Kaliste Saloom; and Rue Chavaniac, which is farther to the southwest on Kaliste Saloom. Ambassador Caffery is a four-lane street both north and south of its intersection with Kaliste Saloom. On the other hand, Kaliste Saloom is a four-lane street northeast of its intersection with Ambassador Caffery, but converts to a two-lane street southwest of that intersection. All three of The Settlement's access points intersect the two-lane section of Kaliste Saloom.

When The Settlement was dedicated in 1979, the dedication included a public right-of-way over a "stub-out" area approximately 125 feet in depth located on the northeast side of Old Settlement between Lots 10 and 79 of the subdivision, and approximately 1,000 feet from Old Settlement's intersection with Kaliste Saloom. The depth of the stub-out corresponded to the depth of the two lots, and the stub-out area is identified on the plats in the record as Homestead Way. The northeastern boundary of the stub-out area lies adjacent to the southwest boundaries of property belonging to the Persons and the First Lutheran Church.

The City-Parish's intent in filing the expropriation proceeding was to acquire immovable property along the southern boundary line of the Persons' property to connect Old Settlement with Settlers Trace Boulevard (Settlers Trace), a street which runs north of, and parallel to, Kaliste Saloom, but that terminates at a point approximately 700 feet from the easternmost point of the stub-out and at its intersection with West Ferrell Boulevard (West Ferrell), a road which runs

generally northwest and southeast,[1] and intersects Kaliste Saloom at a point east of its intersection with Old Settlement.

The immovable property the City-Parish seeks to expropriate consists of 10,596 square feet for the right-of-way itself along the 429.47-foot southern boundary of the Persons' property, together with an additional 6,633 square foot area for a public facility servitude. At no time prior to the action by the City-Parish was the Persons' southern property line subject to a public or private right-of-way.

The facts giving rise to this litigation began to develop in the early 1990s. At some point after The Settlement was dedicated in 1979, the property owners formed the "Settlement Residents' Association" (Association) governed by a board of directors (Board).[2] The Board delegated responsibility to different committees it created to formulate policy and make recommendations concerning certain aspects of subdivision life to the membership. One of those committees pertinent to this litigation is the Traffic Committee. However, the first action, which ultimately became a part of this litigation, appears to have come from individuals seeking to abandon the public right-of-way evidenced by the stub-out.

On March 23, 1999, at the request of individuals purporting to represent The Settlement,[3] the City-Parish Council enacted an ordinance abandoning the right of

---

[1]While running generally northwest and southeast, West Ferrell actually forms a "T" intersection with Settlers Trace as it intersects that road from the southeast. Settlers Trace terminates at the intersection, but West Ferrell turns ninety degrees to the left, extends approximately 205 feet in a southwesterly direction, and then makes another ninety degree turn, this time to the right, and continues in a northwesterly direction along the eastern boundary of the Persons' property.

[2]While the record contains numerous records of the Association, it does not contain any articles or by-laws setting forth the particulars of the Association's organizational structure.

[3]The exhibits in the record contain much discussion to the effect that those who sought the abandonment of the right-of-way in 1999 did not represent the will of the Association, but

way across the stub-out area. A few days later, on April 1, 1999, the City-Parish President executed an act of abandonment that conformed to the ordinance. The act of abandonment specifically declared that the City-Parish Council had determined "that said right-of-way is no longer needed for public purposes." However, on November 6, 2007, the City-Parish Council reversed itself by enacting a new ordinance declaring "the construction of the Settlers Trace Extension project to be a public necessity." The extension project referred to in this ordinance was the project to connect Settlers Trace into Homestead Way, which, of necessity, required the acquisition of property belonging to the Persons.

The City-Parish then began actively pursuing the acquisition of the necessary rights-of-way and public facility servitudes from four different property owners to begin construction on the extension project. It purchased the required rights-of-way from three of the affected property owners, but the Persons refused to sell. On February 11, 2010, the City-Parish filed a petition to expropriate the Persons' property. The only issue before the trial court was whether the City-Parish was entitled to the expropriation remedy.

The record before us includes minutes of meetings of the Association, its Board, and its various committees. A reading of these exhibits reflects that, while other reasons for the project at issue were stated, the driving force for the extension of Settlers Trace into Homestead Way has been an attempt to address the complaints from some subdivision residents concerning problems exiting onto Kaliste Saloom from Old Settlement during peak traffic periods. These same exhibits make it clear that the Settlers Trace extension project was popular, even

_____

there is no direct evidence to that effect.

with advocates, only if every effort could be made to prohibit or impede the public's use of the extension.

As early as March 2003, the Association had pursued the idea of having a traffic light installed at the intersection of Old Settlement and Kaliste Saloom, but a traffic survey performed by the City-Parish's engineering department revealed that "there was generally insufficient traffic volume and/or historical traffic crashes to warrant the installation of a traffic light." A consultant hired by the Association to review the results of the traffic survey concurred in the findings. The consulting firm recommended that the speed limit within the subdivision be reduced and that the Association consider connecting Homestead Way with Settlers Trace. However, a 2005 survey of The Settlement residents revealed that there was significance resistance to the latter idea out of fear that the Association would have no control over the connection.[4] In fact the minutes of a Traffic Committee meeting held March 23, 2006, referenced only attempts by the committee to pursue the concept of a *private* road connecting Homestead Way with Settlers Trace. The importance of the private road concept was emphasized again in the April 2006 newsletter with the following comment

> The importance of developing this road as a private initiative is the ability to control the use of the road and thereby decrease the volume of traffic which would occur if the road is developed at sometime in the future by [the City-Parish].

(Emphasis in the original.)

In fact, at this point in time, the Traffic Committee had already entered into discussions with representatives of the City-Parish concerning the private road

---

[4]This history was provided in the Association's April 2006 annual meeting newsletter as part of the report of the Traffic Committee.

concept and understood it had an agreement with the City-Parish that, if the Association paid for the road extension, it would be permitted to maintain a gate on Homestead Way to control the traffic entering and leaving the subdivision.

At a May 21, 2006 special meeting of the Association, the Traffic Committee offered a resolution that would put the issue of extending of Homestead Way to a vote of the membership. The rationale for this recommendation was found in the following language of the resolution:

> WHEREAS, the Traffic Committee has determined that the Homestead Way extension is justified by several public purposes including: (a) increasing public safety by substantially reducing the volume of traffic entering and leaving The Settlement at the Kaliste Saloom Road/Old Settlement Road intersection, thereby reducing traffic congestion and the probability and incidence of traffic accidents; (b) providing a second access point to The Settlement and nearby subdivisions for police, fire, ambulance and other emergency vehicles, thereby reducing emergency response time, especially during periods of heavy traffic on Kaliste Saloom Road; and (c) reducing traffic volume at the Ambassador Caffery Parkway/Kaliste Saloom Road intersection where traffic on Kaliste Saloom Road is reduced to a two-lane roadway.

However, the resolution continued by stating that the recommendation was *not* for a public road:

> WHEREAS, the Traffic Committed has also determined that The Settlement should not become a subdivision through which through traffic routinely flows between Ambassador Caffery Parkway and Kaliste Saloom Road and *vice versa* in an effort to avoid the Ambassador Caffery Parkway/Kaliste Saloom Road intersection, and that, therefore, Homestead Way extension should be a private roadway, with controlled access to The Settlement subdivision, limited by the installation of a controlled-access gate located just northwest of the current termination point of Homestead Way, as shown on the attached diagram.

Specifically, the resolution called for limiting access to the subdivision to Association members and suggested that if rights-of-way could not be obtained by

the Association, the City-Parish should expropriate the needed property and the Association should then purchase the property from the City-Parish.

The Association members present at the meeting passed the resolution, and, pursuant to its terms, ballots were mailed to all Association members to allow them to vote on the Traffic Committee recommendations. All ballots were due back no later than June 21, 2006. The *private road* concept was approved by eighty percent of those voting, with eleven percent voting against the concept, and nine percent not voting.[5]

Although approved by the Association members, the private road concept did not survive other issues. By a letter to the Association members dated October 2, 2006, the Traffic Committee Chairman informed them that the private land owners were not willing to grant rights-of-way for the Homestead Way extension to North Farrell. Because the necessary rights-of-way were not readily available, the Traffic Committee met with representatives of the City-Parish Traffic Committee to discuss alternative solutions. According to the correspondence, the City-Parish Traffic Committee was willing to recommend to the City-Parish Council that the extension be built as a public road, with the Association paying only for the cost of the expropriation of the stub-out on Homestead Way.

The City-Parish Traffic Committee was unwilling to recommend that the City-Parish expropriate the property and then convert it into a private road, but was willing to recommend construction of roundabouts at three key locations which would "slow traffic down to 20 mph or less and *discourage outsiders* from using the route." (Emphasis added.) Included within this correspondence was a new

---

[5]As previously stated, the record does not contain a copy of the Association's articles or by-laws, but a June 2, 2006 letter from the Traffic Committee Chairman states that to be approved, the resolution must pass by "a vote of 75% of our membership who choose to vote."

ballot for the Association members to express their approval or disapproval of the new approach. The ballot asked Association members to address two issues: whether they were in favor of a public road, and whether it should allow one-way or two-way traffic. The letter required that the ballots be returned by October 10, 2006.

This proposal did not meet with the same support as the private road concept. When counted by the Traffic Committee at a October 15, 2006 meeting, the total was recorded as sixty-nine "In Favor" and sixty-two "Opposed." The minutes of the October 15, 2006 meeting do not include an accounting of how those who voted in favor of the public road voted on the issue of whether the road should be one-way or two-way. However, two separate motions submitted at a Board meeting of the Association held October 23, 2006, addressed this issue by asserting that forty-six members preferred two-way traffic, forty preferred one-way traffic, and forty-five expressed no preference. The motions purported to authorize the Traffic Committee to proceed with the development of a public road, but only after exhausting every effort to develop the proposed project as a private road with controlled access. The Board passed one or both of these motions.[6]

This action prompted a letter from Alan K. Breaud, one of the subdivision residents, addressed to all other subdivision residents, wherein he pointed out, among other things, that the Association by-laws required a seventy-five percent affirmative vote to assess members of the Association with expenses not otherwise covered in the budget of the Association. In summarizing his concerns, Mr.

---

[6]It is unclear which motion actually passed as the minutes of the October 23, 2006 board meeting reflect only that one motion was submitted and passed by a vote of seven to zero.

Breaud stated the following:

> It is quite offensive that the rallying call of the Traffic Committee is the suggestion that destroying our neighborhood is solely for the purpose of increasing our safety in exiting the subdivision. The City's traffic engineer who they brought to the last subdivision meeting advised everyone that we could not get a traffic light at the intersection of our subdivision and Kaliste Saloom Road for two reasons: (1) there was not a sufficient traffic count; and (2) there were no serious reported accidents at that location. We all have been assured that the traffic count will soon be increasing so that probably will allow the city to re-examine its criteria in putting a traffic light either at Old Settlement Road or at Meyers Road (Lafayette Health Club) which would be accessible to us via Rue Chavaniac.
>
> If the public is allowed to use Old Settlement Road and Lakeside as their detour around the intersection of Kaliste Saloom and Ambassador Caffery, many of us will have a substantial safety issue merely getting out of our driveways. For those of you who like to walk, jog or ride your bikes down our streets, your life will be in danger. Right now we have to take precaution upon leaving the subdivision, but with the public cutting through our subdivision and safety will be jeopardized within the subdivision itself.

A letter dated November 1, 2006, from Edwin G. Preis, Jr., another subdivision resident, expressed the same concerns as those raised by Mr. Breaud, and also pointed out that the Association by-laws required a seventy-five percent approval before any Association member could be assessed an amount to cover subdivision improvements.[7]

Notwithstanding Mr. Breaud's complaints and concerns, and before receipt of Mr. Preis' correspondence, the officers of the Association, by a letter to the City-Parish dated October 24, 2006, requested that the City-Parish Council "initiate action to build a two-lane roadway from Old Settlement Road to Farrell

---

[7]By correspondence to all Association members dated November 16, 2006, the Association President attempted to set forth the history of the problems facing the subdivision, and to respond to the complaints of Mr. Breaud and Mr. Preis. In doing so, the President acknowledged the seventy-five percent requirement in the by-laws, but referenced another section of the by-laws as authority for the proposed assessment to the individual members for the cost of the expropriation of the stub-out.

Road/Settlers Trace" with the understanding that the Association would fund the cost of reacquiring the stub-out right-of-way on Homestead Way. The internal dispute between the residents of the subdivision continued into 2007, with correspondence and petitions being circulated among all concerned parties.

Mr. Carroll, who was accepted by the trial court as an expert in civil engineering, has been employed by the City-Parish since 1991, and has functioned as Lafayette's Director of Public Works since 2004. Although he was generally familiar with the controversy, he only became directly involved in the Settlers Trace extension project *after* it was authorized and funded by the City-Parish Council. When the project came before the City-Parish Council, he recommended it as a public necessity because, as noted in Section 2 of the enabling ordinance, it would "provide for improved traffic flow and public safety." In his opinion, the extension would "improve traffic flow by providing more opportunities for ingress and egress." Specifically, he felt that the presence of a traffic signal at the intersection of Ambassador Caffery and Settlers Trace would allow a safer method for the subdivision residents to leave and enter the area since there is no traffic signal at the primary ingress and egress point, the intersection of Kaliste Saloom and Old Settlement. Mr. Carroll also suggested that the extension would provide "greater flexibility" for emergency traffic.

Although he recommended the extension project to the City-Parish Council as a public necessity, at trial Mr. Carroll asserted only that the project served a "public purpose." He admitted that between December 2003 and December 2007, neither The Settlement nor the need for public safety access had changed significantly. He also acknowledged that the abandonment of the original stub-out was done without consulting his office and without studies to support or oppose the

action. Specifically, he considered that action by the City-Parish Council to have been politically motivated. In fact, he acknowledged that his personal distaste for that particular action clouded his professional judgment when faced with a 2003 effort to establish a connection on Old Settlement closer to its intersection with Kaliste Saloom.[8] He opposed that project because he was frustrated with the decision to abandon the stub-out and felt the subdivision should be required to live with its decision. Mr. Carroll testified that he did attend at least one Association meeting and acknowledged that the primary point of contention expressed was the problem of making left turns out of the subdivision onto Kaliste Saloom.

Mr. Carroll admitted that no traffic analysis had been performed when the City-Parish authorized the funding of this project,[9] nor had any been performed when he recommended the project to the City-Parish. At the same time, he acknowledged that widening Kaliste Saloom west of its intersection with Ambassador Caffery had also been declared a public necessity. He summarized his analysis as follows:

> I'm unaware of an analytical traffic studies generating volumes and numbers, but there again, looking at our experience and determining – *from our gut-feel* – what would happen.

(Emphasis added.)

With regard to whether a traffic signal should have been considered for the intersection of Kaliste Saloom and Old Settlement, Mr. Carroll deferred to Mr. Tramel.

---

[8]In 2003, when the studies suggested the Kaliste Saloom/Old Settlement intersection did not warrant a traffic light, there was an effort to establish a parallel connection to Kaliste Saloom on Old Settlement in close proximity to the intersection itself.

[9]Construction costs were estimated to be $415,000.00, with total costs projected to reach $645,000.00.

Mr. Carroll testified that from 2003 to 2007 significant development occurred in the area around the subdivision: the new Lourdes hospital, the extension of Ambassador Caffery to U. S. Highway 90, and the Academy, Kohls, and Super Target stores. However, the record contains no evidence concerning the location of these developments relative to the subdivision.

Mr. Tramel was accepted by the trial court as an expert civil engineer with a specialty in traffic and transportation issues. He testified that while there were no formal studies of analytical data generated, raw data existed of traffic counts and accident reports. He claimed that he looked at alternatives, the first being placing a signal at the intersection of Old Settlement and Kaliste Saloom, but rejected that alternative. While on the one hand, the statistics available to him would not require a light under the Manual on Uniform Traffic Control Devices and DOTD, on the other, Kaliste Saloom is no longer a state highway and those requirements are not applicable. Mr. Tramel testified that a traffic light was not warranted because the traffic counts coming out of the subdivision were not high enough. However, he agreed that expanding Kaliste Saloom would reduce the congestion on that road and might result in signaling at the intersection. He also spoke of the same project referred to by Mr. Carroll closer to Kaliste Saloom.

With regard to the 1999 action of abandoning the stub-out, not only was Mr. Tramel against it, but he was told by his superiors not to comment on it. He also testified that the proposed road serves a "public purpose" and not that it was a "public necessity." Mr. Tramel repeated the reasons set forth by Mr. Carroll for the extension: to provide better interconnectivity and traffic flow in and out of The Settlement; to enhance the ability for public safety personnel to enter the

subdivision; to address additional public safety issues; to increase traffic safety; and to provide The Settlement residents with access to a signalized intersection.

Mr. Tramel testified that he had data based on engineering observations, traffic data, traffic volume counts, traffic turning counts, accident reports, and crash reports, and that he used that information, as well as his thirty-nine years of experience and personal observations of the traffic congestion in the area, to conclude that the Settlers Trace extension project was a public necessity. In a March 9, 2007 letter to the Association, Mr. Tramel stated that "[t]his office is supportive of connecting Homestead Way to Farrell Road/Settlers Trace as a local subdivision street to allow residents within The Settlement subdivision to have choices in their access point from their residential area." When testifying at trial, Mr. Tramel said that "with the congestion on Kaliste Saloom Road ever increasing, there's more difficulty all the time for people to get out of this particular subdivision in general. And it seems obvious – intuitively obvious to me that good subdivision transportation planning design give [sic] people choices." Mr. Tramel said that while no analysis had been done on the crashes at the intersection, it was his opinion that there would be a reduction in total traffic crashes when residents were able to get in and out through the proposed extension.

On cross-examination, he was questioned concerning the June 2005 Lafayette 2030 Transportation Plan, which represents a forecast of proper use of land in the future. This plan is reviewed every five years and is relied upon by the City-Parish for its transportation needs. Old Settlement is not identified in the base plan. Nor is it identified in the 2005/2010 plan. Thus, it was never identified as a public necessity. He also agreed the 1999 decision was political and designed "to

13

placate some individuals within the Settlement." He stated that public necessity is determined, not by the engineering department, but by the City-Parish Council.

In December 2006 and January 2007 a private research organization, Better Perceptions, used a hidden video camera and digital recorder over a period of eleven days to audit the traffic exiting The Settlement by turning from Old Settlement onto Kaliste Saloom during peak traffic times: 6:00 to 10:00 a.m. and 4:00 to 6:00 p.m. The record contains a report of the organization's findings for the period between December 18 and December 21, 2006. During that period, the organization counted 971 cars leaving The Settlement. The average wait time to turn onto Kaliste Saloom was 29.71 seconds: thirty-nine percent waited less than fifteen seconds, twenty-four percent waited fifteen to twenty-nine seconds, twenty-three percent waited thirty to fifty-nine seconds, and fourteen percent waited a minute or more.

A report on the potential extension of Settlers Trace into The Settlement prepared by GCR & Associates, a New Orleans firm, cautions that

> If Homestead Way is opened as a public thoroughfare into The Settlement subdivision, non-resident drivers will utilize the roadway as a shortcut to avoid congestion at the intersection of Kaliste Saloom Rd. and Ambassador Caffery Pkwy. Because drivers in Lafayette are unaccustomed to waiting in traffic, the recently growing delays in the area have encouraged drivers to cut through residential subdivisions in order to avoid the growing delays at area traffic lights.

> Non-resident drivers will cut through the subdivision principally during rush hours. In the morning, some drivers heading north on Kaliste Saloom will turn left into the subdivision to avoid the delay at the intersection with Ambassador Caffery, and in the evening, some drivers from [various] locations will continue along Settler's Trace Blvd. into the subdivision in order to avoid congestion at the intersection of Kaliste Saloom & Ambassador Caffery.

The report also warns that

> While the actual volume of cars may not be overwhelming when compared with that of major roadways in the area, residents of The

14

Settlement may object to the additional cars in the neighborhood for various reasons:

- A change in character, from a secluded neighborhood to a busier area, becoming less desirable to residents and potential homeowners who value the privacy and tranquility of The Settlement

- The lack of sidewalks and walking paths would expose walkers, bikers and children as they wait for school busses or play outside

- Speeding cars will necessitate "traffic calming" devices, which may be unsightly and require taking of property for vehicular right-of-way

- Additional non-resident cars in the neighborhood will broaden The Settlement's public exposure, potentially inviting crime and hastening a quick exit onto Settler's Trace for criminals

The conclusions of this report are exactly what the residents of The Settlement have sought to avoid from the time the extension became a point of discussion.

Ms. Breaud, President of the Association at the time of trial, testified that the primary concern of The Settlement residents was the difficulty and/or length of time it takes to make left turns out of the subdivision. She explained that the Association employs an off-duty police officer to stop traffic on Kaliste Saloom and allow The Settlement residents to make left turns out of the subdivision during peak traffic times. She had been President since 2009, and testified that the Traffic Committee no longer exists. She found the Traffic Committee's actions and the issue of the extension of Settlers Trace were very divisive within The Settlement, as the residents were almost equally divided on the issue before the court. Additionally, she did not feel that the prior vote, being so close, was indicative of the will of The Settlement, because a later petition signed by seventy individuals more or less negated the sixty-nine person vote.

Mr. Person testified that he purchased the property in the early 1990's and built his home in 1994. He was aware of the possible extension when he bought the property because the plats showed an area marked for future development alongside his property. He declined to sell the right of way because he does not think a road is necessary. His grandchildren visit often and he built where he did was because it was quiet. The proposed extension would create an irregular property line for him as it curves into his front yard. He already has a problem because the traffic is significant on West Farrel, which people use as a shortcut to avoid the intersection of Kaliste Saloom and Ambassador Caffery. Mr. Person feels the City-Parish Council acted arbitrarily because the extension is a purely political decision based on the connections between the public officials and certain residents of The Settlement.

Dr. Wiersig, a Houston, Texas engineer, was recognized by the trial court as an expert in civil engineering with special knowledge of transportation, planning, traffic operations, traffic safety, roadway design, and planning for municipalities, including expropriating private property for public purposes.

Dr. Wiersig testified that his career experiences included many situations wherein municipalities were required to justify expropriating private property. He explained the process in the following manner:

> Well, the key aspect in acquiring property for a public necessity in the case of a public purpose is defining the need. You know, necessity is associated with a need, and what's the level of the need, and how those define certain – either thresholds or values that it's a necessity to have it. It's required. There's no other options. Or if there are other options, how are they weighed individually against each other to define the necessity and need for it.
>
> So a planning process, an analysis process is undertaken at an appropriate level to define those needs so that as you bring forward options and solutions you define the problem, you define the solutions

and relatively how good or how bad you're meeting the needs and what's the necessity associated with that.

After evaluating all the evidence, Dr. Wiersig concluded that the City-Parish provided no documentation of a quantified, defined need for the extension. In describing the analysis undertaken in the planning process to determine public necessity for expropriation of private property, Dr. Wiersig stated that a need must be defined and options must be considered.

Dr. Wiersig reviewed the documentation used to justify the extension, including traffic counts, accident reports, pictures, design drawings, all memoranda introduced at trial, deposition testimony, plans and activities associated with the transportation planning activities in the Lafayette area, and the City-Parish 2030 Transportation Plan. Dr. Wiersig testified that, although reasons for the extension were offered to justify the expropriation, the City-Parish witnesses did not provide any further information that quantified the need for the project. Dr. Wiersig pointed out that, although Mr. Tramel and Mr. Carroll had stated that the new road would enable emergency access, there was no information explaining where the fire and police stations were located and demonstrating how the new road would improve their response times.

In other words, Dr. Wiersig concluded, both Mr. Carroll and Mr. Tramel listened to the discussions within the community and gathered information that could have been helpful in making an engineering decision, but they went no further. That is to say, their decision was

> not really documented or justified from a professional transportation, traffic engineering perspective in terms of addressing the two critical things that have been identified as the need, which is the safety and mobility of the area – of the people living in Settler's Trace, as well as the general public utilizing the arterial streets that the two – the

existing Old Settlement intersects, as well as the Settler's Trace extension would move forward to.

According to Dr. Wiersig, there has been no effort to analyze the traffic crash data. He suggested an effort should have been made to determine the nature of these accidents, i.e., were they rear-end collisions, left-turn accidents, or the result of other causes? He noticed that most were rear-end accidents for people traveling on Kaliste Saloom. Additionally, a number of the others were on roads not pertinent to the issue before us. Between 2005 and 2010 only six accidents occurred while people were making a left turn from Old Settlement Road onto Kaliste Saloom. Thus, the real safety issue on Kaliste Saloom was people striking left-turning motorists from the rear. The crash data also established that the majority of the accidents occurred in the afternoon, not in the morning rush to leave the subdivision. The real problem, he suggests, is the queue created by individuals traveling on Kaliste Saloom northeast toward the city who are backed up because of the congestion on the two-lane road. In his opinion, this will be resolved when Kaliste Saloom is four-laned. Dr. Wiersig said the proposed project would have little or no effect on the accident problem.

The next factor, according to Dr. Wiersig, is traffic volume. There are only 158 lots in the subdivision and two roads service these households. Based on the available data, a maximum of 115 vehicles attempt to exit the Subdivision at peak hours and an average of 1,500 per day come in and out. According to Dr. Wiersig, the situation as it now exists is adequate.

On cross examination Dr. Wiersig stated that he was initially of the opinion there was not sufficient documentation to show that an appropriate analytical process was undertaken to determine whether the proposed road extension was a

public necessity. After looking at all of the data, he concluded that the available evidence did not justify a finding of public necessity. He concluded that Mr. Carroll and Mr. Tramel either did not do the analysis or chose to ignore it because it did not lend itself to the obviously required conclusion of necessity. He also pointed to Mr. Tramel's conclusion that, after performing an analysis, a traffic signal was not warranted. Dr. Wiersig said the off-duty officer was providing a convenience and not a necessity, as shown by the fact that others were making left turns off intersecting streets without the help of an officer.

Following the two-day trial, held on September 7 and 8, 2010, the trial court issued a judgment in favor of the City-Parish. It held that the City-Parish demonstrated by a preponderance of the evidence that a public need existed for the proposed extension and that there was no evidence that the City-Parish abused its discretion or was arbitrary and capricious in choosing the location and extent of the property to be expropriated.

The Persons now appeal, with two assignments of error:

1.      Whether the Trial Court erred in finding that LCG [the City-Parish] demonstrated by a preponderance of evidence that a public need exists for the proposed extension.

2.      Whether as a matter of law the Trial Court erred in failing to find that LCG's [the City-Parish's] actions were arbitrary, capricious and in bad faith and without underlying principles.

**OPINION**

In their first assignment of error, the Persons contend that the City-Parish did not carry its burden of proving, by a preponderance of the evidence, that the Settlers Trace extension is a public necessity.

Louisiana recognizes a person's "right to acquire, own, control, use, enjoy, protect, and dispose of private property." La.Const. art. I, Sec. 4(A). However, "[t]his right is subject to reasonable statutory restrictions and the reasonable exercise of the police power." La.Const. art. I, Sec. 4(A). The state and its political subdivisions may take property "for public purposes and with just compensation paid to the owner or into the court for his benefit." La.Const. Art. 1, Sec. 4(B)(1). Article 6, Section 23 of the Louisiana Constitution states "[s]ubject to and not inconsistent with this constitution and subject to restrictions provided by general law, political subdivisions may acquire property for any public purpose by purchase, donation, expropriation, exchange, or otherwise." And our Constitution also recognizes that "[r]oads, bridges, waterways, access to public waters and lands, and other public transportation, access, and navigational systems available to the general public," are a "public purpose." La.Const. Art. 1, Sec. 4(B)(2)(b)(ii).

However, Louisiana has long recognized that expropriation "is special and exceptional in character, in derogation of common right, and must be strictly construed." *State v. Jeanerette Lumber & Shingle Co., Ltd.*, 350 So.2d 847, 855 (La.1977), *quoting Orleans-Kenner Elec. RY Co. v. Metarie Ridge Nursery Co.*, 136 La. 968, 68 So. 93, 95 (1915).

Here, the City-Parish brought its expropriation action under La.R.S. 19:102, which states, in pertinent part, "[w]here a price cannot be agreed upon with the owner, any municipal corporation of Louisiana may expropriate property whenever such a course is determined to be necessary for the public interest by the governing authority of the municipality." Under this statute, the municipal authority has the burden of showing, by a preponderance of the evidence, that there is a public need

or interest in the expropriation. *Recreation and Park Com'n for the Parish of E. Baton Rouge v. C&S Dev., Inc.*, 97-2652 (La. 7/8/98), 714 So.2d 706.

In *Town of Broussard v. Ducrest*, 98-838, p.3 (La.App. 3 Cir. 12/9/98), 722 So.2d 1174, 1176, this court held that "[o]nce a municipality has decided that the expropriation of a landowner's property is necessary for the public interest, a court may not set aside such a determination absent finding that the decision was unreasonable or arbitrary." But it is essential to remember that La.R.S. 19:102 "does not preclude judicial review of the issue of whether an expropriation is being made for public purposes as required by LSA-Const. Article 1, § 4." *City of Lafayette v. Delhomme Funeral Home, Inc.*, 413 So.2d 348, footnote 3 (La.App. 3 Cir. 1982).

"Even though the expropriating authority has wide discretion in determining the necessity and extent of a taking, this discretion is not unbridled. Our supreme court has stated 'the expropriating authority should be in a position to justify and support with cogent reasons' the taking for an appropriate purpose. *Jeanerette Lumber*, 350 So.2d at 855." *State, Dept. of Transp. & Dev. v. Estate of Griffin*, 95-1464, p. 7 (La.App. 1 Cir. 2/23/96), 669 So.2d 566, 570. "Questions such as the location of the expropriation, the extent of the property taken, the nature of the title to be taken, and the wisdom of pursuing the particular improvement project relate to the necessity of the taking." *Calcasieu-Cameron Hosp. Serv. Dist. v. Fontenot*, 628 So.2d 75, 78 (La.App. 3 Cir. 1993), *writ denied*, 94-168 (La. 3/18/94), 634 So.2d 854.

The trial court's factual determinations as to necessity or expediency of an expropriation will not be reversed on appeal in the absence of manifest error.

*Estate of Griffin*, 669 So.2d 566; *Calcasieu-Cameron Hosp. Serv. Dist.*, 628 So.2d 75.

In arguing that the City-Parish failed to demonstrate a public need for the extension project, the Persons point out that the City-Parish did not undertake any studies to determine the necessity of the extension.[10] Further, the Persons' expert, Dr. Wiersig, did not find evidence that the City-Parish utilized information that quantified the public necessity for the extension.

Louisiana courts have recognized that when considering how much weight to give to an expert's testimony the courts must consider the experts' qualifications and the facts on which they base their opinions. *Quinones v. United States Fid. & Guar. Co.*, 93-1648 (La. 1/14/94), 630 So.2d 1303. The City-Parish conceded that it did not conduct any independent studies assessing the public necessity of the project. Mr. Carroll and Mr. Tramel said that they based their opinions that the project is a public necessity on an analysis of traffic data, an evaluation of the growth of the surrounding area, and their own experiences and expertise. However, all of the information concerning traffic flow and accident rates on which they based their opinions was general information concerning Kaliste Saloom Road, nothing that specifically applied to the existing or the proposed access to The Settlement. The information on which the City-Parish relied could be used to justify a governmental entity taking *any* property that was adjacent to the Kaliste Saloom Road.

---

[10]This court has held that "*Daubert* is applicable where the complaint is to the methodology or some new scientific or medical technique that may be used by an expert witness in his or her testimony. Here the defendants complain of nothing more than the correctness of the factual basis underlying the experts' opinions. That being the case, the *Daubert* factors are not relevant." *Cox v. Shelter Ins. Co.*, 09-958, pp. 23-24 (La.App. 3 Cir. 4/7/10), 34 So.3d 398, 413, *writ denied*, 10-1041 (La. 9/17/10), 45 So.3d 1044.

Although The Settlement, or at least some of its residents, has sought to have the City-Parish create a new road accessing The Settlement, it is clear that those same residents are doing everything they can to make the new road function like a private road, not a public one. The plans to accomplish this include lowering the speed limit through The Settlement and installing roundabouts to discourage through traffic.

In 2003 neither the traffic volume nor the history of traffic crashes justified installing a traffic light at the intersection of Old Settlement and Kaliste Saloom, in large part because at that time Kaliste Saloom was a state highway. The possibility of installing a light at that intersection was never revisited, even though Kaliste Saloom is no longer a state highway. Additionally, both Mr. Carroll and Mr. Tramel admitted that no analysis had been performed to determine the current or projected traffic volume, accidents, or emergency response times that would be affected by the proposed extension project. Mr. Tramel testified that it was "intuitively obvious" to him that good transportation design would give people more choices on how to enter and exit the subdivision. Mr. Carroll testified that it was his "gut-feel" that the proposed road extension would improve the traffic volume and public safety. Dr. Wiersig, who reviewed all the available material, testified that the City-Parish had never defined a need for the proposed extension project.

In order to invoke expropriation, the governmental body must establish more than general traffic patterns on a road and the opinions or gut-feelings even of experts. The record before us establishes that the impetus for and justification of this public road are the convenience of some of The Settlement's residents. Given the City-Parish's failure to produce objective evidence that there is a public need or

interest in the expropriation, we hold that the trial court manifestly erred in finding that the expropriation is being made for public purposes within the meaning of La.Const. Article 1, § 4.

In their second assignment of error the Persons also challenge the trial court's judgment that no evidence existed that the City-Parish abused its discretion or was arbitrary and capricious in choosing the location and extent of the property expropriated. Because we have reversed the trial court's decision based on the first assignment of error, we do not reach the Persons' second assignment of error.

## DISPOSITION

For the foregoing reasons, we reverse the judgment of the trial court and render judgment in favor of Jeffery and Sheila Persons. Costs of this appeal are assessed to the Lafayette City-Parish Government. Pursuant to La.R.S. 13:5112, we assess the costs at $2,714.39.

**REVERSED AND RENDERED.**

LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT

VERSUS

JEFFERY C. PERSON, ET AL.

**THIBODEAUX, Chief Judge, dissenting.**

This is a fairly straightforward manifest-error case. The majority focuses on factual circumstances which, though interesting, are determinatively irrelevant. The justification for expropriation "is derived primarily from the testimony of the witnesses," according to the majority. That is true. The trial court chose to place more weight on the testimony of the City-Parish's experts. An appellate court should defer to that finding. While the majority concludes that the City-Parish did not produce "objective" evidence of the public need for expropriation, the record belies that assertion.

The City-Parish requires approximately 10,596 square feet for the road right-of-way and 6,633 square feet for a public facility servitude to construct the two-lane roadway along the 424 foot eastern boundary of the Persons' property. Tom Carroll, the City-Parish's Director of Public Works, worked for the engineering firm that created the Settlement subdivision layout. He testified that when the Settlement was dedicated in 1979, the dedication included a "stub-out" and right-of-way on Homestead Way. The extension sought by the expropriation connects Settlers Trace through the Persons' property to the Homestead Way stub-

out, which intersects with Old Settlement. This extension would allow access to the light at Ambassador Caffery, a street which intersects with Settlers Trace.

Since the early to mid-1990s, significant growth has occurred in the area surrounding the Settlement subdivision. The Settlement was originally created with only two access points, both of which only allow for ingress and egress on Kaliste Saloom, which is a two-way road with a speed limit of forty miles per hour. Betty Meyers, President of The Settlement Residents' Association (TSRA) and Mr. Carroll, a licensed Civil Engineer,[1] testified that the primary concern of the Settlement residents was the difficulty and/or length of time it takes to make left turns out of the subdivision. The issue with the traffic at Old Settlement and Kaliste Saloom is compounded by the fact that the TSRA employs an off-duty police officer to stop traffic on Kaliste Saloom and allow the Settlement residents to make left turns out of the subdivision during peak traffic times.

Mr. Carroll testified that from 2003 to 2007, significant development has occurred in the area around the subdivision. Specifically, the following developments have been built within a half-mile radius of the proposed Settlers Trace Extension project: the new Lourdes hospital, the extension of Ambassador Caffery to Highway 90, and the Academy, Kohls, and Super Target stores. Mr. Tramel testified that the last traffic volume report from his department indicated that approximately 25,000 - 30,000 vehicles travel on Kaliste Saloom each day. Mr. Tramel stated that in his opinion, a road is congested when 10,000 - 15,000 cars per day travel on a two-lane road. Based on the surrounding growth and the

---

[1]The City-Parish offered the testimony of two experts at trial. Tom Carroll, the City-Parish's Director of Public Works, was accepted as an expert in civil engineering. Tom Tramel, the City-Parish's Director of Traffic and Transportation, was accepted as an expert in civil engineering with a specialty in traffic and transportation.

2

problems associated with having only two access points for ingress and egress, the TSRA passed a resolution stating their desire to connect Settlers Trace to the Homestead Way stub-out.

Following the TSRA's resolution, the City-Parish proposed Ordinance No. O-249-2007 to the Lafayette City Council. The Council unanimously approved the Ordinance and declared the construction of the Settlers Trace Extension Project a public necessity. On November 8, 2007, the Lafayette City-Parish President signed the Ordinance.

Thereafter, the City-Parish began actively pursuing the acquisition of the necessary rights-of-way and public facility servitudes from four different property owners to begin construction on the extension project. It purchased the required rights-of-way and servitudes from the three other affected property owners, but the City-Parish and the Persons were unable to reach an agreement on the issue of the taking.

**Standard of Review**

A trial court's factual determinations as to necessity or expediency of an expropriation will not be reversed on appeal in the absence of manifest error. *State, Dep't of Transp. & Dev. v. Estate of Griffin*, 95-1464 (La.App. 1 Cir. 2/23/96), 669 So.2d 566; *Calcasieu-Cameron Hosp. Serv. Dist. v. Fontenot*, 628 So.2d 75 (La.App. 3 Cir. 1993), *writ denied*, 94-168 (La. 3/18/94), 634 So.2d 854. When the expropriating authority has met its burden of proof in an expropriation action that requires the trial court to make a factual determination, the Court of Appeal will not disturb the trial court's ruling absent manifest or clear error. *Town of Broussard v. Ducrest*, 98-838 (La.App. 3 Cir. 12/9/98), 722 So.2d 1174.

3

## Analysis of Louisiana Law on Expropriation

The Persons contend that the Settlers Trace extension is not a public necessity and that the City-Parish's decision to create the extension was arbitrary, capricious, and unnecessary.

The right to acquire, own, and enjoy private property is a well-settled right in Louisiana. This right, however, is not without limits. Indeed, this right is subject to the right of expropriation, when required by public interest and necessity. *Town of Broussard*, 722 So.2d 1174. The authority of a municipality to expropriate property is outlined in La.Const. Art. 1, § 4 and La.R.S. 19:102. Specifically, La.Const. Art. 1, § 4 states in pertinent part:

> (A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.

> (B)(1) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit.

"Once a municipality has decided that the expropriation of a landowner's property is necessary for the public interest, a court may not set aside such a determination absent finding that the decision was unreasonable or arbitrary." *Town of Broussard*, 722 So.2d at 1176 (citations omitted). To determine the necessity of the taking, the municipality must evaluate the location and extent of the taking. *Id.* Once the expropriating authority has met its burden of proving that the taking is a public necessity, the burden shifts to the landowner to show that the expropriating authority has abused its discretion in selecting its location. *Id.*

4

"The expropriating authority abuses its discretion when it acts in bad faith, without adequate determining principles, or without reason." *Id.* Criteria to be considered by the expropriating authority in deciding whether to expropriate include: [A]vailability of an alternate route, costs, environmental factors, long-range area planning, and safety considerations." *Red River Waterway Com'n v. Fredericks*, 566 So.2d 79, 83 (La.1990).

### *Public Necessity*

In arguing that the City-Parish failed to demonstrate a public need for the extension project, the Persons assert that the City-Parish did not undertake any studies to determine the necessity of the extension. The Persons further contend that their expert, Doug Wiersig, did not find evidence that the City-Parish utilized information that quantified the public necessity for the extension.

By arguing that the City-Parish's experts did not undertake any studies to support its decision to expropriate, the Persons, in effect, challenge the methodology employed by the City-Parish's experts. Questions regarding the validity of the methodology employed by an expert bring into play the analysis of *Daubert v. Merrell Dow Pharm.*, 509 U.S., 579, 113 S.Ct. 2786 (1993). *MSOF Corp. v. Exxon Corp.*, 04-988 (La.App. 1 Cir. 12/22/05), 934 So.2d 708, *writ denied*, 06-1669 (La. 10/6/06), 938 So.2d 78. Here, however, the Persons never made a *Daubert* challenge to the methodology of the two experts offered by the City-Parish. Thus, once admitted as experts, the trial court's evaluation of the experts' testimony is subject to the manifest error standard of review, "unless the stated reasons of the expert are patently unsound." *Zimko v. American Cyanamid*, 03-658, p. 29 (La.App. 4 Cir. 6/8/05), 905 So.2d 465, 486, *writ denied*, 05-2102

(La. 3/17/06), 925 So.2d 538. Here, these opinions were solidly grounded in data and experience.

Mr. Carroll and Mr. Tramel were accepted by the trial court as experts, without objection. Mr. Carroll received a degree in civil engineering, is a licensed professional engineer, a licensed land surveyor, and has been employed with the City-Parish since 1991. Mr. Tramel also holds an undergraduate engineering degree and received a Masters of Science in Engineering and a Masters of City Planning. Mr. Tramel is a registered engineer in Louisiana, Texas, Florida, and Oklahoma.

Both Mr. Carroll and Mr. Tramel testified that as civil engineers and, as Directors at the City-Parish, they recommended to the Council that it find that the extension project was a public necessity. Mr. Carroll and Mr. Tramel testified that the public purpose served in Ordinance No. 249-2007 was to provide for improved traffic flow and public safety. Specifically, Mr. Carroll testified that the proposed extension would provide: (1) the opportunity to access Settlers Trace; (2) an additional means of ingress/egress; (3) more flexibility of emergency personnel services; and, (4) residents the option of using a signalized intersection at Ambassador Caffery. Similarly, Mr. Tramel stated the reasons for the proposal were: (1) to provide better interconnectivity and traffic flow in and out of the Settlement; (2) to enhance the ability for public safety personnel to enter the subdivision; (3) to address additional public safety issues; (4) to increase traffic safety; and, (5) to provide the Settlement residents with access to a signalized intersection.

Though the City-Parish did not conduct any independent "studies" assessing the public necessity of the project, Mr. Carroll and Mr. Tramel based

their opinions that the project is a public necessity on an analysis of traffic data, an evaluation of the growth of the surrounding area, and their own experiences and expertise. It is well-settled that an expert may provide testimony based upon a variety of sources, including information obtained from others, and "the character of the evidence upon which the expert bases an opinion affects only the weight to be afforded the expert's conclusion." *MSOF Corp.*, 934 So.2d at 720.

Specifically, Mr. Carroll testified that he applied his thirty-seven years of experience, expertise, and engineering knowledge to consider the facts in making an informed decision about whether the project was necessary. Additionally, Mr. Carroll used the information he possessed, as well as the information received from Mr. Tramel through the Department of Traffic and Transportation, in forming the basis of his recommendation that the project was a public necessity. Mr. Tramel testified that he possessed data based on engineering observations, traffic data, traffic volume counts, traffic turning counts, accident reports, and crash reports. His department utilized that data in its decision-making process. Mr. Tramel's extensive file on this matter included over 600 pages of documents. Mr. Tramel testified that he used this information, as well as his thirty-nine years of experience and personal observations of the traffic congestion in the area, to formulate and provide his recommendation to the Council that the Settlers Trace Extension project was a public necessity.

In rebuttal, the Persons offered the testimony of Doug Wiersig, Ph.D. The court accepted Dr. Wiersig as an expert in civil engineering with special knowledge of transportation, planning, traffic operations, traffic safety, roadway design and planning for municipalities, including expropriating private property for public purposes. Somewhat ironically, the majority cites a lack of "objective"

7

evidence of public need, yet fails to point out any "studies" done by Dr. Wiersig or his use of any "objective" evidence. He simply reviewed and critiqued the methodology of Mr. Tramel and Mr. Carroll.

Dr. Wiersig testified that in his opinion, the City-Parish provided no documentation of a quantified defined need for the extension. In describing the analysis undertaken to determine public necessity for expropriation of private property, Dr. Wiersig testified that a need must be defined. Dr. Wiersig testified that in the planning process of such a project, an analysis is undertaken to define the needs and to bring forward options and solutions. Dr. Wiersig reviewed the documentation that existed to justify the need for the extension including traffic counts, accident reports, pictures, design drawings, all memorandums introduced at trial, deposition testimony, plans and activities associated with the transportation planning activities in the Lafayette area, and the 2030 Transportation Plan. Dr. Wiersig testified that although reasons for the extension were offered for the expropriation, the City-Parish's witnesses did not provide any further information that quantified the need for the project.

The trial court considered the testimony of the three experts and determined that the City-Parish proved by a preponderance of the evidence that a public need exists for the proposed extension. That determination was sound and reasonably based on the entire record of testimony and exhibits. It should not be disturbed because a different outcome is desired.

### Allegations that the City-Parish Acted Arbitrarily and Capriciously

Given the trial court's determination of public need, the Persons also challenge the trial court's judgment that no evidence existed that the City-Parish

abused its discretion or was arbitrary and capricious in choosing the location and extent of the property expropriated.

Ample evidence suggests that the City-Parish thoroughly considered the appropriate factors in determining the extent and location of the property to be expropriated, including: the "availability of an alternate route, costs, environmental factors, long-range area planning, and safety considerations." *Red River Waterway Com'n,* 566 So.2d at 83.

Indeed, the trial court acted reasonably and in good faith in determining the necessary extent and location of the property subject to the taking.[2] Mr. Carroll, acting in his capacity as a land surveyor, prepared the property plat showing the area to be acquired from the Persons. The plat illustrates that the proposed Road Right of Way will require a total of 10,596 square feet of land area, of which approximately 2,010 square feet is within an existing permanent utility servitude. The Permanent Public Facility Servitude to be acquired will require an approximate 6,633 square feet of land area, of which approximately 3,842 square feet is within an existing permanent utility servitude. Mr. Carroll's survey indicates that the City-Parish will leave a total of 116,407 square feet of the Persons' property untouched.

Before making any recommendations to the Council, the City-Parish thoroughly discussed and analyzed all possible alternatives to the extension of Settlers Trace into Homestead Way. The City-Parish thoroughly considered at least five separate alternatives, including: (1) traffic signalization at Old Settlement and Kaliste Saloom; (2) alternative point of ingress/egress out of the

---

[2]As the trial court aptly observed, the proposed extension had been considered for years. Though the City-Parish had, at one time, abandoned its right-of-way on Homestead Way, at the time the Persons purchased their property, they were aware that an extension into the Settlement

9

Settlement approximately 200 to 300 feet from Kaliste Saloom; (3) realignment of Kensington Road with Old Settlement Road; (4) construction of three lanes of roadway on Kaliste Saloom from Old Settlement to North Meyers; and, (5) widening of Kaliste Saloom to four or five lanes from Ambassador Caffery to Highway 733. The record more than adequately supports the City-Parish's ultimate conclusion that none of these proposed alternatives were viable solutions and that the best solution was the proposed extension of Settlers Trace.

The City-Parish considered the long range planning, environmental considerations, and safety considerations of the site by examining the traffic patterns, traffic collisions, and projected growth around the proposed extension. Specifically, the City-Parish analyzed all traffic crashes on Ambassador Caffery to East Broussard Road from 2002 through 2007. It also considered the fact that due to the expansive growth of the area and high traffic volume, a private security officer is currently employed to direct residents out of the Settlement, inhibiting traffic flow on Kaliste Saloom. The City-Parish also considered the ability of emergency personnel to access the area. All of these factors supported the City-Parish's decision that the extension was a public necessity and that the Settlers Trace route was the best solution.

For the foregoing reasons, I dissent and would affirm the judgment of the trial court.

---

was contemplated. Indeed, the plat under which the Persons acquired their property made reference to the future extension of Homestead Way to Farrel Road through their land.